IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BRIAN RAY, individually and on behalf of
all others similarly situated,
          Plaintiff,

v.                                Civil Action No. 3:25cv132

ATLANTIC UNION BANK,
          Defendant.

## OPINION

When the plaintiff, Brian Ray, opened his bank account, the defendant, Atlantic Union Bank ("the Bank"), provided him with a notice describing its overdraft policies. The Bank did so to comply with 12 C.F.R. § 1005.1, *et seq.* ("Regulation E"), a Consumer Financial Protection Bureau ("CFPB") rule promulgated so that consumers would understand financial institutions' practices before opting into certain overdraft programs. The CFPB also provides a model opt-in form that banks must substantially follow to comply with Regulation E. The opt-in form Ray received largely resembled the CFPB's model.

Yet Ray now brings this class action alleging a violation of Regulation E. He argues that the Bank's form failed to adequately describe the timing or method of assessing overdraft fees. The Bank moves to dismiss the complaint for lack of standing or, in the alternative, moves for summary judgment. Ray, in turn, moves to certify a class of the Bank's accountholders who opted into the relevant overdraft program and were assessed a fee after February 19, 2024.

Because Ray has evidence of a redressable injury traceable to the Bank, he has standing. Accordingly, the Court will deny the Bank's motion to dismiss. Further, the Court will deny the motion for class certification because Ray has failed to prove that all class members received the

same allegedly defective notice. Finally, the Court will grant the Bank's motion for summary judgment because the CFPB's model language adequately described its overdraft program.

## I. <u>BACKGROUND</u>

### A. Overdraft Practices Generally

Banks must describe their overdraft practices to consumers before they can assess overdraft fees on debit card or ATM transactions. *See* 15 U.S.C. § 1693c(a); 12 C.F.R. § 1005.17(b). Most debit transactions occur in two stages. During the first, a person swipes a card, and the bank "authorize[s]" the transaction by agreeing to pay the amount later. *See Va. is for Movers, LLC v. Apple Fed. Credit Union*, 720 F. Supp. 3d 427, 433 (E.D. Va. 2024). At the second stage, the bank or other financial institution "settle[s]" by actually paying the amount due. *See id.*

"A bank may calculate a customer's balance for overdraft purposes with reference to either of these two phases." *Id.* (citation omitted). Under the "available balance" methodology, a bank looks to authorized but unsettled transactions—that is, transactions which banks "are obligated to pay," but have yet to exchange money—*and* settled transactions. *Id.* In "actual balance" methodology, the bank considers "only transactions that have settled"—that is, "those where funds have already changed hands." *Id.* Under the actual balance methodology, a bank will not assess an overdraft fee when an account has only authorized but unsettled funds in it. *See id.*

### B. The Bank's Overdraft Practices

At the Bank, transactions result in an overdraft fee in the following way: First, the Bank authorizes transactions by reference to an accountholder's *available* balance. (Melton Dep. 35:8–12 (ECF No. 59-1, at 14).) The Bank will then settle charges once a day "at the end of [its] nightly processing." (*Id.* at 16:23–17:2 (ECF No. 59-1, at 5–6).) After nightly settling, the Bank calculates an accountholder's "current balance." (*Id.* at 16:16–17:2 (ECF No. 59-1, at 5–6).) The current

2

balance includes only "posted," or settled, transactions. (*Id.*) Only when a person's current balance has insufficient funds will the Bank assess an overdraft fee. (*Id.* at 19:16–18, 32:15–17 (ECF No. 59-1, at 7, 12).) Accordingly, "[t]he available balance is not considered" when *assessing* a fee, but is considered when authorizing transactions. (*Id.* at 32:21–25 (ECF No. 59-1, at 12).)

The parties agree that the Bank assesses fees using the current balance. To the Bank, this amounts to the use of *actual* balance. (*See* ECF No. 35, at 10.) Ray, however, argues that current balance and actual balance are distinct because, under "industry standards," institutions update actual balance throughout the day. (*See* ECF No. 58, at 10.)

### C. Ray's Dispute

Ray opened an account with the Bank on August 19, 2021. (Melton Dep. 21:1–3 (ECF No. 35-1, at 8).) As part of the account creation paperwork, Ray agreed to a contract with the Bank ("the 2020 agreement") specifying the terms of the parties' relationship. (ECF No. 10-2.) The 2020 agreement did not contain any provision discussing dispute resolution or class waiver. (*See generally id.*) It did, however, contain a broad amendment provision authorizing the Bank to change "any term" of the agreement. (*Id.* at 6.) As mandated by law, the Bank also provided Ray with a Regulation E "Opt-In Form" purportedly describing the Bank's overdraft policies. (Melton Dep. 24:15–25:2 (ECF No. 35-1, at 11–12).) The Bank's form nearly mimicked the model provided by the CFPB. (*Compare* ECF No. 10-1, *with* 12 C.F.R. § 1005 app. § 1005.17 (A-9).)

At the top, the form read: "**What You Need to Know about Overdrafts and Overdraft Fees.**" (ECF No. 10-1, at 2 (emphasis in original).) It then stated, "An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we [the Bank] pay it anyway." (*Id.* (emphasis in original).) The form clarified that the Bank would cover overdrafts for automatic bills and check transactions, but that customers had to affirmatively opt into the

3

Bank's overdraft program for debit card and ATM transactions. (*Id.*) After acknowledging the Bank's discretion to decline covering overdrafts, the form mentioned a charge "up to $38."[1] The form then provided a fillable space in which the customer could check a box authorizing (or not) the Bank to pay ATM and debit card overdrafts. (*Id.*) The customer had to specify which accounts were included in the opt-in program. (*Id.*) Finally, the form provided a spot for the customer's signature. (*Id.*)

Ray read the Opt-In Form either while opening his account or shortly thereafter. (Ray Dep. 44:22–45:2 (ECF No. 59-1, at 40–41).) He chose to participate in the Bank's overdraft program for ATM and debit card transactions. (Melton Dep. 23:22–25:21, 27:21–28:6 (ECF No. 35-1, at 10–12, 14–15).)

On November 22, 2021, the Bank revised the Opt-In Form. It now said that "[a]n overdraft occurs when the *current balance* in your account is insufficient to cover a transaction at the time of settlement, but we pay it anyway." (ECF No. 38-15 (second emphasis added).) Further, in 2021, the Bank changed the terms of its agreement with Ray, although the amendments provision remained substantively identical. (ECF No. 10-3, at 6.) In 2024, the Bank made one final relevant amendment by inserting a class action waiver provision into Ray's agreement. (ECF No. 10-4, at 37.)

Ray has continued to use his account, and the Bank has assessed him several $38 overdraft fees. (ECF No. 35-1, at 74, 77, 80, 83).)

---

[1] (*Id.*) The Bank reports that it decreased this fee to $35 in October 2025. (Melton Dep. 62:11–16, ECF No. 35-1, at 21).)

## II. <u>STANDING</u>

The parties dispute whether Ray has standing to pursue this lawsuit.  If he lacks standing, then the Court has no power to decide any other issue in this case.  *See Trantham v. Tate*, 112 F.4th 223, 231 (4th Cir. 2024) (citation omitted) ("[S]tanding is jurisdictional.").  Accordingly, the Court begins by addressing this threshold issue.  For the reasons explained below, Ray has standing, and the Court can proceed to a merits analysis.

### *A. Legal Standard*

Federal courts have jurisdiction only over actual "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  In a genuine case, the plaintiff has "a personal stake in the outcome of the controversy."  *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted).  Courts call this personal stake "standing."  *See id.*  A plaintiff can demonstrate standing by showing "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"Plaintiffs bear the burden of establishing standing."  *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181 (4th Cir. 2013) (citation omitted).  Because the standing elements "are . . . an indispensable part of the plaintiff's case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561 (citations omitted).  Accordingly, at the summary judgment stage, a plaintiff cannot rely on "'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to show standing.  *Id.* (citing Fed. R. Civ. P. 56(e)).  If the parties dispute the material facts of standing at summary judgment, then "those facts . . . must be 'supported

adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone, Realtors v. Vill. of Bellwood,* 441 U.S. 91, 115 n. 31 (1979)).

### B. Discussion

Despite the Bank's insistence to the contrary, Ray satisfies all three standing elements. His summary judgment evidence demonstrates that the Bank's notice confused him and that he lost money in the form of overdraft fees while using his account—a "quintessential injury in fact."[2] Further, the Court can redress this injury by awarding actual damages and other monetary relief. *See* 15 U.S.C. § 1693m (authorizing damages in Regulation E cases). The parties do not seriously dispute these injury and redressability prongs.

But the Bank disputes causation. This element requires that "the plaintiff's injury was caused by the challenged conduct of the defendant." *Sheppheard v. Morrisey,* 143 F.4th 232, 243 (4th Cir. 2025) (citation omitted). The defendant's challenged actions, however, need not "be the sole or even immediate cause of [a plaintiff's] injury." *Id.* (alteration in original) (citation omitted). Still, "'a highly attenuated chain of possibilities' will not support a theory of Article III standing." *Lowy v. Daniel Def., LLC,* 167 F.4th 175, 195 (4th Cir. 2026) (citation omitted).

At least one sister court has applied similar causation principles to require that a plaintiff must have read and been confused by a bank's allegedly defective Regulation E notice to have standing. *See, e.g., Cornell v. Desert Fin. Credit Union,* No. CV-21-835, 2025 WL 2606169, at *6 (D. Ariz. Sept. 8, 2025). If a plaintiff fails to read a notice, then the writing "could not have influenced her subsequent decision whether to opt into the program" or whether to overdraft her

---

[2] *Penegar v. Liberty Mut. Ins. Co.,* 115 F.4th 294, 302 (citing *Trans Union,* 594 U.S. at 425) ("[P]ast monetary loss is the quintessential injury in fact."); *see* (ECF No. 59-1, at 26, 51–52 (depositions of two Bank employees noting that the Bank assessed a fee)).

account. *Id.* (citation omitted). Accordingly, a plaintiff who did not read might have only a "highly attenuated," if non-existent, connection between the notice and any overdraft.[3]

Ray has offered sufficient evidence to show that he read and was confused by the Bank's notice. During his deposition, Ray testified that he "did" review a disclosure about overdrafts "during the sign-up process." (Ray Dep. 44:10, 44:22–45:2 (ECF No. 59-1, at 40–41).) Although he then admitted to possibly reading the disclosure only after signing up, Ray still testified to reading the relevant notice. (Ray Dep. 45:3–7 (ECF No. 59-1, at 47).) And despite Ray's reading the notice, he remained confused about the Bank's overdraft process. Indeed, he stated that he understood neither the "difference between an available balance and a current balance" nor "the circumstances under which [the Bank] charges an overdraft fee." (Ray Dep. 30:8–12, 35:18–21 (ECF No. 59-1, at 37, 38).) Accordingly, Ray demonstrated a causal link between the Bank's challenged conduct and his overdrafts: Had the notice provided different wording, Ray might not have overdrafted.[4]

Accordingly, Ray has standing.

---

[3] *See Lowy*, 167 F.4th at 195. Ray repeatedly asserts that he need not show that he read the Bank's notice because "Regulation E contains no reliance requirement." (ECF No. 58, at 12–13 (quoting *Monroe v. Anderson Bros. Bank*, 4:25-cv-06007, 2025 WL 3470728, at *5 n.2 (D.S.C. Dec. 3, 2025).) Because the Court finds that Ray relied in part on the notice, it assumes without deciding that Regulation E has a reliance element for Article III standing purposes. The doctrine of standing requires some form of causation even if Regulation E itself does not. *See Sheppheard*, 143 F.4th at 243.

[4] The Bank's arguments to the contrary fail. First, construing all facts in favor of the nonmovant, the Court finds enough evidence that Ray read the notice at the time of signing up and was confused. *See Lujan*, 504 U.S. at 561 (applying the summary judgment standard of evidence during standing analysis). Further, the Bank argues that it could not have harmed Ray because it uses actual balance methodology, a more consumer-friendly method to assess overdraft fees. Nevertheless, Ray disputes that the Bank's use of "current balance" amounts to use of industry-standard actual balance. The Court, therefore, cannot definitively say that the Bank uses a consumer-friendly method that caused no harm.

### III. CLASS CERTIFICATION

Ray asks the Court to certify the following class pursuant to Federal Rule of Civil Procedure 23(b)(3):

> All of Defendant's checking account holders who, from February 19, 2024[,] to present, were opted into overdraft protection for onetime debit card transactions and ATM transactions and were assessed overdraft fees on these transactions.

(ECF No. 41, at 10.)

The Bank, however, argues that Ray waived his right to bring a class action, that the class has standing problems, and that the class fails to adhere to Rule 23. Because Ray fails to prove that the class has common questions that predominate over the litigation as required by Rule 23(b)(3), the Court cannot certify the proposed class.

### A. Legal Standard

The class action is a method of resolving cases where the large "number of those interested in the subject of the litigation" renders the "usual rules of procedure . . . impracticable." *Hansberry v. Lee*, 311 U.S. 32, 41 (1940). Given the difficulties of joining many interested plaintiffs, class actions allow "a representative party to prosecute his own claims and the claims of those who present similar issues." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006) (citation omitted). Allowing a named plaintiff to represent absent parties "is an exception to the general rule that a party . . . may vindicate only his own interests." *Id.* (citation omitted).

A plaintiff may freely "give up, in exchange for some contractual benefit, the right to proceed by way of an actual class action." *In re Marriott Int'l, Inc.*, 78 F.4th 677, 686–87 (4th Cir. 2023) (citation omitted). If a plaintiff has agreed "to a valid and enforceable class waiver," then courts should honor the bargain between the parties and decline to certify a class. *Id.* at 686

8

(citation omitted). Accordingly, a court must address a contractual class waiver claim "before, not after, a class is certified." *See id.*

A certified class must comply with Article III's standing requirements, *see Lewis v. Casey*, 518 U.S. 343, 349 (1996), and if the named plaintiffs lack standing, the claim may not proceed, *see Blum v. Yaretsky*, 457 U.S. 991, 1001 (1982). Still, the class action may continue if "[a]t least one [named] plaintiff" has standing. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (alterations added). And although "[e]very class member must have Article III standing to *recover* individual damages," *TransUnion LLC*, 594 U.S., at 431 (alteration and emphasis added), "district courts . . . need not find that *all* of the unnamed class members possess Article III standing" at the class certification stage, *Spurlock v. Wexford Health Sources, Inc.*, --- F.4th ---, 2026 WL 1204643, at *10 (4th Cir. May 4, 2026) (published) (emphasis added).

In addition to satisfying the standing doctrine, a class action must also comply with the rigorous requirements of Federal Rule of Civil Procedure 23. *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011). Rule 23(a) enumerates four prerequisites, while Rule 23(b) describes types of lawsuits for which a group remedy most neatly resolves the alleged harm. *See* Fed. R. Civ. P. 23(a), (b).

### B. Discussion

#### 1. *Waiver*

The Bank argues that Ray waived his ability to bring a class action by accepting an amended account agreement. But Ray never expressly agreed to a waiver, and despite its arguments otherwise, the Bank had no authority to insert a class waiver without Ray's express consent.

The parties' initial account agreement said nothing about Ray's power to join or bring classes. The agreement did, however, have an amendment provision that reads:

9

> We [the Bank] may change any term of this agreement. Rules governing changes in interest rates are provided separately in the Truth-in Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. . . . If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

(ECF No. 10-2, at 6 (alteration added).)[5]  In 2024, the Bank sent Ray an email to notify him of pending amendments, including a class waiver, to his agreement. (ECF No. 47-1, at 5.)  When Ray failed to object within 30 days, the 2024 account agreement allegedly took effect with the following new provision:

> NEITHER THE BANK NOR YOU WILL BE ENTITLED TO PARTICIPATE IN, JOIN, OR CONSOLIDATE CLAIMS OR DISPUTES BY OR AGAINST OTHERS AS A REPRESENTATIVE OR MEMBER OF A CLASS, TO ACT IN ANY ARBITRATION OR LITIGATION IN THE INTERESTS OF THE GENERAL PUBLIC, OR TO ACT AS A PRIVATE ATTORNEY GENERAL.

(ECF No. 10-4, at 37.)  Because Ray failed to object to the 2024 amendment and continued to use his account, the Bank believes he waived his right to bring the current class action.

Under Virginia law,[6] courts determine a party's contractual powers by interpreting the language of the contract as set down by the parties.[7]  If the language at issue has one clear "plain

---

[5] The initial agreement was drafted in 2020.  The Bank released an amended account agreement that contained a substantively identical "change in terms" provision in 2021. (ECF No. 10-3, at 6.)

[6] Federal courts generally apply the choice-of-law rules of the state in which they sit.  *See Koppers Performance Chems., Inc. v. Argonaut-Midwest Ins. Co.*, 105 F.4th 635, 640 n.4 (4th Cir. 2024) (citation omitted).  Under Virginia law, if the parties to a valid contract specify what law applies to the agreement, "the parties' choice of substantive law should be applied." *Settlement Funding, LLC v. Von Neuamann-Lillie*, 274 Va. 76, 80, 645 S.E.2d 436, 438 (2007).  Here, the parties' most recent agreement acknowledges that "federal law" or, "where not superseded by federal law, the law of the state where [Ray's] account is located" governs the agreement. (ECF No. 10-4, at 37.)  Because no federal contract law supersedes the contract law of Virginia in this case, Virginia law applies.  Neither party disputes this application.

[7] *See Klein v. Verizon Commc'ns, Inc.*, No. 1:12cv757, 2017 WL 5071306, at *5 (E.D. Va. Aug. 9, 2017) (applying Virginia law to determine the scope of a party's power to modify); *PBM*

10

meaning" in light of the whole contract, that ordinary interpretation prevails. *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 179, 788 S.E.2d 237, 244 (2016). But where a contract is reasonably "subject to multiple interpretations in view of the entire contract," courts should hold the challenged language ambiguous. *James River Ins. Co. v. Doswell Truck Stop, LLC*, 297 Va. 304, 306, 827 S.E.2d 374, 376 (2019). Any "ambiguity must be construed against the drafter of the agreement." *Martin & Martin, Inc. v. Bradley Enters.*, 256 Va. 288, 291, 504 S.E.2d 849, 851 (1999).

The parties offer equally tenable plain readings of the 2020 and 2021 account agreements' amendment provision. The Bank rightly recognizes that a "change-in-terms provision" authorizes the addition of wholly new terms when the contract "is expansive in its reference to what terms might be modified." *Klein*, 2017 WL 5071306, at *5. The instant change-in-term provision, indeed, includes expansive language: The Bank "may change *any* term of this agreement." (ECF No. 10-3, at 6 (emphasis added).) And although the agreement expressly contemplates changes to interest rates, it acknowledges that a broader array of "other changes" may occur.[8] Further, the change-in-terms provision recognizes that "a change in any term of [the] account" can amount to "new term(s)." (*Id.*) The Bank, therefore, seemingly has wide power to substantively revise the agreement so long as it gives notice.

---

*Nutritionals, LLC v. Lexington Ins. Co.*, 283 Va. 624, 636, 724 S.E.2d 704, 714 (2012) (citation omitted) (construing a contract "as written").

[8] (*Id.*) Importantly, the agreement does not specify whether these "other changes" happen to the contract as a whole or just to a limited subsection. (*See id.*) Because the agreement does place a limitation on what "other changes" may occur, one could plausibly read it as offering an expansive power to the Bank.

But Ray points to the same language to show the Bank's power is limited. Indeed, the phrase "any term of this agreement" can also mean that the Bank may change only all those terms *included in the original contract*. And the agreement does not clearly state whether "change" means a slight modification or a wholesale redrafting. Either interpretation of "change"—equally plausible in the eyes of the Court—proves problematic. If "change" means only a slight modification, it contradicts the expansive language used elsewhere in the agreement. If by contrast "change" means *any* addition, subtraction, or modification, it "would permit the Bank to add terms . . . without limitation." *Stone v. Golden Wexler & Sarnese, P.C.*, 341 F. Supp. 2d 189, 198 (E.D.N.Y. 2004) (applying Virginia law).

Because the contract "is subject to multiple interpretations," it is ambiguous. *James River*, 297 Va. at 306, 827 S.E.2d at 376. The Court, therefore, construes the phrase against the Bank as drafter of the agreement. *See Martin & Martin*, 256 Va. at 291, 504 S.E.2d at 851. Accordingly, neither the 2020 nor 2021 agreements permitted the Bank to add a wholly new class waiver provision into Ray's agreement. Ray, in turn, could not assent to a waiver clause inserted contrary to the account agreement's terms by mere continued use of his contract.

For these reasons, Ray did not waive his right to bring or join a class action.[9]

### 2. Class Standing

The Bank further argues that the Court cannot certify the proposed class because the named plaintiff and many class members lack standing. (ECF No. 47, at 16.) To comply with Article III, at least the named plaintiff must have standing. *Town of Chester*, 581 U.S. at 439. When the named plaintiff satisfies this requirement, some number of "unnamed class members" need not

---

[9] Because the Bank did not have the authority to add the class waiver, the Court declines to reach Ray's remaining arguments against waiver.

12

have "Article III standing" at the class certification stage. *Spurlock*, 2026 WL 1204643, at *10. Nevertheless, district courts have discretion to deny certification when a sufficiently large number of members lack standing. *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 934 (4th Cir. 2025) ("[T]he presence of 32% of uninjured members in a proposed class strikes us as much too high."). Ultimately, when assessing class members' standing at certification, a court should ensure that it attends "to actual harms rather than abstract grievances," *Wells v. Johnson*, 150 F.4th 289, 298 (4th Cir. 2025) (citation omitted), "without unnecessarily overburdening the judicial system" by auditing each absent class member, *Spurlock*, 2026 WL 1204643, at *10.

The proposed class has no standing problem at this stage. As explained above, Ray himself has standing because he suffered a redressable and concrete injury traceable to the Bank. *See supra* Part II.B. Further, absent class members—all of whom "were assessed overdraft fees"—will likewise have suffered concrete and redressable injuries. (ECF No. 41, at 10.) Moreover, the Court finds no evidence in the record that a sufficiently large percentage of absent members pose traceability problems, so it declines to deny certification on that ground without more. Indeed, the Bank does not provide a particular number of absent members without standing, but asks the Court to assume that "a *large* number of putative class members lack standing" because Ray lacks standing. (ECF No. 47, at 17.) The Court will not simply guess at a number of individuals who might lack standing. And even if the class had some members who lacked standing, the Court can preserve a class action's efficiencies by "exclud[ing]" members "from the class when their lack of standing becomes apparent." *Spurlock*, 2026 WL 1204643, at *10 n.7.

### 3. *Rule 23 Analysis*

Having determined that neither waiver nor standing prevent class certification, the Court turns to the Rule 23 analysis. As explained above, a court cannot certify a class until it satisfies

the requirements of Rules 23(a) and (b). Rule 23(a) imposes four prerequisites: (1) A group so numerous that joinder is impracticable; (2) questions of fact or law common to the class; (3) class representatives with claims or defenses typical of the class; and (4) named plaintiffs who can fairly and adequately protect the class's interests. Fed. R. Civ. P. 23(a)(1)–(4). Further, the class must fall into a category described in Rule 23(b). Relevant here, Rule 23(b)(3) permits a court to certify a class when common questions of fact and law "predominate over any questions affecting only individual members" and when the class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In assessing the predominance and superiority elements of a (b)(3) class, a court may consider four factors: (A) class members' interest in controlling separate actions; (B) previous litigation started by class members concerning the instant controversy; (C) the desirability of litigating in a particular forum; and (D) the likely difficulties of managing the class. *Id.* Finally, the Fourth Circuit requires an implied Rule 23 prerequisite—"ascertainability." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (collecting cases) (citations omitted). "Ascertainability" means "that the members of a proposed class be 'readily identifiable'" through objective criteria. *Id.* (citations omitted).

If the proposed class fails on just one of these many requirements, the Court should decline certification. *See G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 209 (4th Cir. 2024) (reversing certification for failure of just one prerequisite). In this case, Ray's class definition has fatal commonality and predominance problems.

All certified classes must have "questions of law or fact" in "common." Fed. R. Civ. P. 23(a)(2). This commonality rule "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Importantly, class members

14

may have some unique issues of law and fact, but the class as a whole must raise questions whose "common *answers*" will "drive the resolution of the litigation." *EQT Prod.*, 764 F.3d at 360 (emphasis in original) (citation omitted). "A single common question will suffice" so long as it resolves "an issue central to the validity of each one of the claims in one stroke." *Id.*

Like commonality, the predominance requirement concerns shared questions in the class. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997). Still, predominance "is far more demanding" than commonality. *Id.* at 624 (citation omitted). Whereas commonality looks to the mere existence of common issues, predominance looks to the importance of these issues. *See In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 542 (E.D. Va. 2006). Accordingly, common questions predominate when they "are more prevalent or important than the non-common, aggregation-defeating individual issues." *Tyson Foods, Inc. v. Bouphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). If a defendant's liability "turns on a consideration of the individual circumstances of each class," a court should not certify the class. *Thorn*, 445 F.3d at 319.

Generally, predominance is satisfied when a financial institution uses "standardized documents and practices." *Talbott v. GC Servs. Ltd. P'ship*, 191 F.R.D. 99, 105–06 (W.D. Va. 2000) (citing *Halverson v. Convenient Food Mart, Inc.*, 69 F.R.D. 331 (N.D. Ill. 1974)); *see also S.C. Nat'l Bank v. Stone*, 139 F.R.D. 325, 333 (D.S.C. 1991). Courts frequently certify classes in Regulation E cases when a bank applies the same overdraft methodology and uses a standard opt-in notice. *See, e.g., In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 154-55 (D.S.C. 2018) (noting that "form contracts" applied to both the named plaintiff and the class members). This allows the Court to assess the merits of the class's claims by examining the same legal questions and factual circumstances. *See id.*

15

Here, Ray cannot show that the Bank provided a uniform opt-in notice to all class members. The class consists of "[a]ll . . . checking account holders" who opted into the relevant overdraft protection and "were assessed overdraft fees." (ECF No. 41, at 10.)  But not all the checking account holders received the same notice.  From at least July 2020 to November 21, 2021, the Bank provided opt-in notices that Ray complains of: "An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." (*Compare* ECF Nos. 38-13 and 38-14 (emphasis in original), *with* ECF No. 38-15.)  On November 22, 2021, however, the Bank revised the opt-in notice to state that "[a]n <u>overdraft</u> occurs when the *current balance* in your account is insufficient to cover a transaction at the time of settlement, but we pay it anyway." (ECF No. 38-15 (second emphasis added).)  Further, the Court has no evidence showing what opt-in notices said before July 2020, although the class presumably includes people who opened their accounts before that time.

This change in language cuts to the heart of the legal claim in this case.  Ray's Regulation E claim argues that the Bank's "Opt-In Form"—notably singular—"fails to state when or how [the Bank] determines overdrafts." (ECF No. 1 ¶ 98.)  Particularly, he complains that the notice (1) "fails to explain how [the Bank] determines whether there is 'enough money' in the account to pay a transaction'" and (2) "does not explain whether overdrafts are determined at authorization or settlement." (*Id.* ¶ 62.)  Thus, the changed opt-in form potentially addresses Ray's essential complaints: It changes the "enough money" language and explains that overdrafts occur "at the time of settlement." (ECF No. 38-15.)  Accordingly, the common legal question in this case—

16

whether the opt-in form violated Regulation E—would require distinct merits inquiries for members who received distinct notices.[10]

The Court declines to certify the proposed class under Rule 23(b)(3) because it lacks a predominate legal question. Because the class fails at least one Rule 23 requirement, the Court will not reach the remaining arguments.

### III. SUMMARY JUDGMENT[11]

The Bank now moves for summary judgment against Ray. Because the Bank used a model form issued by the CFPB while using the actual balance methodology, the Court will grant the Bank's motion.

#### A. Overview of Regulation E

15 U.S.C. § 1693m(a) permits "any consumer" to sue "any person who fails to comply with any provision" of the Electronic Fund Transfer Act. That Act states that "[t]he terms and

---

[10] Ray argues that the Court can use generalized proof to examine uniform changes in contractual language across a class, but his supporting cases are inapposite to his own. In *South Central Bank v. Johnson*, the defendant made contractual changes "uniformly to the Classes," so the same language applied to each class member. No. 2023-CA-1171-ME, 2024 WL 3381384, at *9 (Ky. Ct. App. July 12, 2024). Further, the court in *Gunter v. United Federal Credit Union* also found that "[a]ll proposed class members were subject to the same contractual language regarding overdraft fees in their . . . opt-in agreements." 3:15-cv-483, 2017 WL 4274196, at * 5 (D. Nev. Sept. 25, 2017). Here, the Bank provided different dispositive language to different class members.

[11] The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law. A dispute is genuine if a reasonable jury could return a verdict for the non-moving party." *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022) (citations and internal quotations omitted).

When deciding a summary judgment motion, the Court draws all reasonable inferences in the nonmoving party's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and views the facts "in the light most favorable to the nonmoving party," *Somers v. Devine*, 132 F.4th 689, 695 (4th Cir. 2025) (citations omitted). When the movant provides adequate evidence supporting the motion, the nonmovant cannot rely on the pleadings to create factual issues. *See Celotex Corp.*

17

conditions of electronic fund transfers involving a consumer's account shall be disclosed at the time the consumer contracts for an electronic fund transfer service, in accordance with the regulation of the [CFPB]." *Id.* § 1693c(a).

In Regulation E, the CFPB prevents a bank from charging overdraft fees on "an ATM or one-time debit card transaction" unless the bank (1) gives written notice "describing the institution's overdraft service," (2) provides a reasonable opportunity for a consumer to opt-in, (3) gets a "consumer's affirmative consent," and (4) confirms that consent in a writing "informing the consumer of the right to revoke" consent. 12 C.F.R. § 1005.17(b)(1)(i)–(iv). Any written notice must "be clear and readily understandable." *Id.* § 1005.4(a)(1). A bank must also "segregate[]" the written notice about overdraft procedures "from all other information." *Id.* § 1005.17(b)(1)(i). The notice cannot "contain any information" not explicitly required by Regulation E. *Id.* § 1005.17(d)(1). Crucially, any notice must "be substantially similar to Model Form A-9," an exemplar form prepared by the CFPB. *Id.* Model Form A-9 states that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we [the Bank] pay it anyway." 12 C.F.R. § 1005 app. § 1005.17 (A-9).

Importantly, Congress provided financial institutions with a safe harbor to some Regulation E claims: "No provision" of § 1693m "imposing liability shall apply to . . . any failure to make disclosures in proper form if a financial institution utilized an appropriate model clause issued by the" CFPB. 15 U.S.C. § 1693m(d).

_____

*v. Catrett*, 477 U.S. 317, 324 (1986). Instead, the nonmovant must use "affidavits," "depositions, answers to interrogatories, [or] admissions on file" to show "a genuine [factual] issue for trial." *Id.* (alterations added) (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

18

### *B. Discussion*

Here, the Bank used language identical to the Model Form A-9, which accurately describes the Bank's overdraft assessment.

The safe harbor applies to this case about the Bank's alleged "failure to make disclosures in proper form." *Id.* § 1693m(d). Despite some courts holding that "form" does not encompass a disclosure's *substance*,[12] "form" can encompass both format and content. *See, e.g., Rader v. Sania Lab'y Fed. Credit Union*, Civ. No. 20-559, 2021 WL 1533664, at *13 (D.N.M. Apr. 19, 2021). Indeed, "form" plainly means a "particular structure[] or construction of things."[13] Even in the context of legal documents, "'form' can mean, among other things, 'the customary method of drafting legal documents, usu[ally] with fixed words, phrases, and sentences." *Adams v. Liberty Bank*, 2021 WL 3726007, at *6 (D. Conn. Aug. 23, 2021) (alteration in original) (quoting *Form*, Black's Law Dictionary (11th ed. 2019)). Accordingly, "the safe harbor provision provides immunity against claims that the structure or construction of the model language provided by the [CFPB] violates Regulation E." *Tilley*, 2018 WL 4600655, at *5 (alteration added). And, here, Ray challenges the model form's language.

Still, the "safe harbor provision requires more than just the use of a model clause; the financial institution must use an '*appropriate* model clause.'" *Adams*, 2021 WL 3726007, at *7 (quoting 15 U.S.C. § 1692m(d)(2)). An appropriate clause "does not misstate facts or inaccurately

---

[12] *See, e.g., Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1244 – 45 (11th Cir. 2019).

[13] *Tilley v. Mountain Am. Fed. Credit Union*, 2:17cv1120, 2018 WL 4600655, at *5 (D. Utah Sept. 25, 2018) (alteration in original) (first quoting *Form*, The Oxford English Dictionary (2d ed. 1991); then citing *Form*, The Random House College Dictionary (rev. ed. 1980)).

represent its overdraft service."[14]  Here, the Bank's opt-in Form did not misstate any fact or offer any misrepresentation.  It does not lie about using a consumer-friendly methodology while using another that benefits the Bank, nor does it wrongly state at what time the Bank assesses the overdraft fee.  Instead, the form used the CFPB's language, which can adequately refer to the Bank's use of something akin to actual balance methodology.  *See Tilley*, 2018 WL 4600655, at *5 (finding that "enough money" could refer to available or actual balance).  Accordingly, the Bank offered an appropriate form issued by the CFPB.

As the Bank notes, any other holding would require the Court to declare "the CFPB's language to be insufficient as a matter of law regardless of the facts." (ECF No. 66, at 15.)  For these reasons, the Court will grant summary judgment in favor of the Bank.[15]

### IV. <u>CONCLUSION</u>

For the reasons stated above, the Court will deny the Bank's motion to dismiss, deny Ray's motion to certify a class, and grant the Bank's motion for summary judgment.

---

[14] *Tilley*, 2018 WL 4600655, at *6.  Some courts have improperly conflated an "appropriate clause" with one that is "clear and readily understandable," the standard in 12 C.F.R. § 1005.4(a)(1). *See, e.g., Adams*, 2021 WL 3726007, at *7.  But collapsing these standards would render the safe harbor provision superfluous.  The safe harbor guards against violations of § 1693m(a), which authorizes civil actions against those who fail to comply with the CFPB's regulations.  The relevant regulation requires "clear and readily understandable" language. *See* 12 C.F.R. § 1005.4(a)(1).  If an "appropriate" clause was simply one that followed the regulation (by being clear and understandable), then Congress would have no need to separate the safe harbor from the merits inquiry.

Accordingly, applying the "inaccurate representation" preserves the safe harbor without allowing financial institutions to use wholly inapposite model language.

[15] Ray also claims to have found new Regulation E deficiencies with the Bank's opt-in form. (ECF No. 58, at 34–35.)  Because a party "may not amend [a] complaint through argument in a brief opposing summary judgment," the Court declines to reach these arguments. *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) (citations omitted).

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: _10 July_ 2026
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

21